Henry MONO, Individually and as Administrator of the Estate of Joyce Mono, Deceased, Plaintiff,

v.

PETER PAN BUS LINES, INC. and William E. Kenney, Defendants.

No. 97 Civ. 2194 (SAS).

United States District Court, S.D. New York.

July 6, 1998.

Paul Weitz, Schneider, Kleinick, Weitz, Damashek & Shoot, New York City, for Plaintiff.

Gregory S. Katz, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, New York City, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Henry Mono brought this wrongful death action against defendants Peter Pan Bus Lines, Inc. ("Peter Pan") and William E. Kenney, the driver of a Peter Pan bus which allegedly struck and killed plaintiff's wife, Joyce Mono. Following a five-day trial, the jury returned a verdict in favor of plaintiff, awarding him and his two sons $1,050,000 in damages. Defendants now move to set aside the verdict pursuant to Fed.R.Civ.P. 50 and move for a new trial or, in the alternative, for a reduction in the jury award, pursuant to Fed.R.Civ.P. 59.

## I. Factual and Procedural Background

Plaintiff alleges that on November 26, 1996, a bus operated by William Kenney and owned by Peter Pan struck and killed Joyce Mono at the intersection of Columbus Avenue and 97th Street in New York City. At the time of the accident, Joyce Mono was 57 years old and was a self-employed bookkeeper. She lived in Manhattan with her husband, Henry Mono, and her 27 year-old son, Brian Mono. Her other son, Lawrence Mono, was 29 years old and lived in California.

On March 13, 1998, the jury returned a verdict of $1,050,000 for plaintiff, allocating damages as follows:

| Henry Mono: | Loss of services and guidance | – | $378,000 |
| | Loss of earnings | – | $324,000 |
| Henry Mono: | Loss of services and guidance | – | $ 48,000 |
| Lawrence Mono: | Loss of services and guidance | – | $240,000 |
| Award for pre-impact terror | | – | $ 10,000 |
| Award for conscious pain and suffering | | – | $ 50,000 |

Defendants now contend that (1) plaintiff's proof was insufficient to support the jury's finding of negligence; and (2) the jury award to Henry Mono and Larry Mono was excessive.

## II. Defendants' Challenge to the Sufficiency of Plaintiff's Evidence

### A. *Legal Standard*

Under Rule 50(b), a court may grant a motion for judgment as a matter of law

following the entry of judgment. The standard for granting such a motion is set forth in Rule 50(a), which provides that the court may decide an issue as a matter of law if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." The Second Circuit has explained this standard as follows:

> [A] district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.... Only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against [the moving party] may the court properly grant the motion.

*LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995), (citations and quotations omitted).[1]

1.· The Second Circuit has not yet resolved the question of whether a court sitting in diversity should evaluate challenges to the sufficiency of evidence under the standard of review prescribed by federal or state law. *See, e.g., Brady v. Chem. Constr. Corp.*, 740 F.2d 195, 202 n. 7 (2d Cir. 1984) (recognizing issue as unsettled and expressly leaving issue unresolved). The majority of circuit courts that have addressed the question have applied the federal standard. *See* 9 James W. Moore, et al., *Moore's Federal Practice* § 50.10 (3d ed.1997) (discussing majority and minority approaches); 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2525 (2d ed.1995) (same); Steven A. Childress, "Judicial Review and Diversity Jurisdiction: Solving an Irrepressible Erie Mystery," 47 SMU L.Rev. 271, 290–98 (1994) (same). However, the Supreme Court's decision in *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), which is discussed in Section III.A, may cast doubt on the continuing validity of the majority approach. *See* J. Benjamin King, Note, "Clarification and Disruption: The Effect of *Gasperini v. Center for Humanities, Inc.* on the *Erie* doctrine," 83 Cornell L.Rev. 161 (1997). Under New York law, a court may not set aside a jury verdict absent a showing that the jury could not have reached its verdict on "any fair interpretation of the evidence." *Pelosi v. TJA Maintenance Programming*, 668 N.Y.S.2d

Under Rule 59(a), a new trial may be granted following a jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Ordinarily, a court should not grant a new trial "unless it is convinced that the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988). Nevertheless, the standard for granting a new trial under Rule 59 is less stringent than the standard under Rule 50. In contrast to a judgment as a matter of law, a new trial may be granted under Rule 59 even if there is substantial evidence to support the jury's verdict. *See Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992). Moreover, a court evaluating a motion for a new trial "is free to weigh the evidence ... and need not view it in the light most favorable to the verdict winner." *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978)).[2]

B. *Discussion*

Defendants contend that the evidence adduced at trial does not support the

706, 708 (2d Dep't 1998); *Texido v. S & R Car Rentals Toronto, Ltd.*, 244 A.D.2d 949, 665 N.Y.S.2d 179, 180 (4th Dep't 1997); *Bernstein v. Red Apple Supermarkets*, 227 A.D.2d 264, 642 N.Y.S.2d 303, 305 (1st Dep't 1996); *Farrell v. Stafford Mach. Corp.*, 205 A.D.2d 951, 613 N.Y.S.2d 766, 769 (3d Dep't 1994). Because defendants' motion to set aside the verdict would be denied under either the state law standard or the federal standard, I need not resolve the choice-of-law question.

2. Defendants' Rule 59 motion also raises an unresolved *Erie* issue—whether the state or federal standard of review applies in a motion for a new trial in a diversity action. New York law does not distinguish between a motion for a new trial and a motion for a judgment notwithstanding the verdict. *See* N.Y. C.P.L.R. § 4404; *Balogh v. H.R.B. Caterers, Inc.*, 88 A.D.2d 136, 452 N.Y.S.2d 220, 224 (2d Dep't 1982). Thus, if state law applies to defendants' Rule 59 motion, the standard of review would be whether the jury could have reached its verdict on "any fair interpretation of the evidence." *Pelosi,* 668 N.Y.S.2d at 708; *Texido,* 665 N.Y.S.2d at 180; *Bernstein,* 642 N.Y.S.2d at 305; *Farrell,* 613 N.Y.S.2d at 769. Because the evidence presented at trial satisfies both the federal and state standards, I need not determine which jurisdiction's law controls defendants' motion for a new trial.

jury's conclusion that Joyce Mono was struck by the Peter Pan bus driven by William Kenney. This argument is rebutted by the testimony of three of plaintiff's witnesses. Plaintiff first called Anita Anderson, who was a passenger on the Peter Pan bus. At approximately 6:50 p.m., as the bus traveled on 97th Street toward Columbus Avenue, Anderson was looking out a window on the left side of the bus. Trial Transcript ("Tr.") at 30, 33. She saw pedestrians crossing Columbus Avenue in a crosswalk. As the bus turned from 97th Street onto Columbus Avenue, "there was just one person who stood out because she was the only person who was left in the crosswalk, and she continued to walk," toward the bus. *Id.* at 30. The female pedestrian "was getting incredibly close to the bus and so I was watching even more because I was getting a little nervous how close she was, and then at one point she was just right up near the bus. Her arms went up, and she kind of jolted like that just back a little bit." *Id.* at 31. Anderson then lost sight of the pedestrian and looked to the right and left to see if the pedestrian had made it past the bus, but she did not see her on either side. *Id.* She then felt a "big bump" under the rear, left wheels of the bus. *Id.* Within twenty minutes of passing the intersection of 97th Street and Columbus Avenue, Anderson reported the incident to a police officer at the Port Authority Bus Terminal. *Id.* at 35.

Patrick Kissane, another passenger who was traveling on the bus driven by Kenney, testified that as the bus turned from 97th Street onto Columbus Avenue, he saw a woman wearing a dark raincoat crossing Columbus Avenue from east to west. *Id.* at 57. Kissane said that the bus came "too close" to the woman and he too felt a bump under the bus' left, rear wheels. *Id.* at 57–58. Joyce Mono, dressed in dark clothing, was found lying at the intersection of 97th and Columbus at approximately 7:00 p.m., *id.* at 83–84, 89, not more than ten minutes after the Peter Pan bus had driven past. *Id.* at 54.

■ Plaintiff also called Dr. Lorne Thanning, who testified that Joyce Mono's injuries were inflicted by a heavy vehicle weighing in excess of ten to fifteen thousand pounds, like a bus or truck, not by a lighter vehicle, like a car.[3] *Id.* at 219. Taken together, the testimony of Anderson, Kissane, and Thanning provides a sufficient basis from which the jury could reasonably conclude that the Peter Pan bus driven by William Kenney struck Joyce Mono. Additionally, considering all the evidence presented at trial by both parties, the jury did not reach a "seriously erroneous result," nor does the verdict constitute a "miscarriage of justice." Accordingly, Defendants' Rule 50 and Rule 59 motions concerning the sufficiency of the evidence presented at trial are denied.

### III. Defendants' Motion For A New Trial on The Issue of Damages

#### A. *Legal Standard*

■ A federal court sitting in diversity must apply state law standards in deciding a motion challenging the size of a verdict and requesting a new trial on damages. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426–31, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). New York C.P.L.R. § 5501(c) provides that a court "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." Thus, federal courts applying New York law should follow the "deviates materially" standard, rather than the more stringent "shock the conscience" standard which governs Rule 59 challenges

---

3. Defendants contend that Dr. Thanning was not qualified to testify concerning the weight of the vehicle and that her testimony on the subject should have been stricken. *See* Defendants' Memorandum in Support of Their Rule 50 and Rule 59 Motions at 10–12. Defendants cite to a portion of Dr. Thanning's testimony in which she stated that she was not qualified to determine the exact weight of the vehicle that ran over Joyce Mono. This so-called "admission" does not undercut Dr. Thanning's testimony that Joyce Mono was run over by a relatively heavy vehicle like a bus or truck, not by a car.

Dr. Thanning is an expert in forensic pathology who has extensive experience investigating accidents involving buses, trucks, trains, and cars, and more specifically, in matching up vehicles with injuries suffered in hit-and-run accidents. *See* Tr. at 218. Thus, she was qualified to testify on the general size of the vehicle that ran over Joyce Mono, and her testimony was properly admitted under Fed.R.Evid. 702.

to the amount of jury awards in federal question cases. *Id.* at 426, 116 S.Ct. 2211. To determine whether an award "deviates materially from what would be reasonable compensation," New York courts look to awards approved in similar cases. *Id.* at 425, 116 S.Ct. 2211 (citing *Leon v. J & M Peppe Realty Corp.,* 190 A.D.2d 400, 596 N.Y.S.2d 380, 389 (1st Dep't 1993); *Johnston v. Joyce,* 192 A.D.2d 1124, 596 N.Y.S.2d 625, 626 (4th Dep't 1993)).

### B. *Discussion*

#### 1. *Award of $240,000 to Lawrence Mono for Loss of Training and Guidance*

The jury awarded Lawrence Mono $240,000 in damages for his loss of parental services and guidance. Under New York law, wrongful death damages are limited to "fair compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefits the action is brought." N.Y. Estates Powers & Trust Law § 5-4.3(a). The term "pecuniary injuries" has been broadly construed to include recovery for the "economically recognized and calculable losses of the household management services of [the deceased]" and "the premature loss of the educational training, instruction and guidance [that the children] would have received from the now-deceased parent." *Gonzalez v. New York City Housing Auth.,* 161 A.D.2d 358, 555 N.Y.S.2d 107, 108-09 (1st Dep't 1990) (quotations omitted); *see also Plotkin v. New York City Health and Hospitals Corp.,* 221 A.D.2d 425, 633 N.Y.S.2d 585, 586 (2d Dep't 1995) (in wrongful death action, pecuniary injury includes children's loss of "paternal nurture and care, as well as physical, moral, and intellectual training" provided by deceased parent). There is no prohibition barring such recovery by an adult child. *See McKee v. Colt Electronics Co.,* 849 F.2d 46, 50-51 (2d Cir.1988); *Loehner v. Simons,* 239 A.D.2d 468, 657 N.Y.S.2d 447, 448 (2d Dep't 1997) (financially independent adults may recover in wrongful death action).

Not surprisingly, courts reviewing jury awards for loss of parental guidance have generally reduced awards to adult children to a fraction of the amount recoverable by infant children. *Compare Rubin v. Aaron,* 191 A.D.2d 547, 594 N.Y.S.2d 797, 799 (2d Dep't 1993) (limiting adult child's loss of parental guidance to $25,000); *Korman v. Pub. Serv. Truck Renting Inc.,* 116 A.D.2d 631, 497 N.Y.S.2d 480, 480 (2d Dep't 1986) (limiting *total* recovery for loss of paternal guidance by two adult children and for wife's loss of household services to $150,000); *Wood v. State,* 112 A.D.2d 612, 492 N.Y.S.2d 481, 484 (3d Dep't 1985) (limiting recovery for adult children's loss of parental guidance to $25,000 per child); *with Klos v. New York City Transit Auth.,* 240 A.D.2d 635, 659 N.Y.S.2d 97, 98-99 (2d Dep't 1997) (permitting recovery of $250,000 *per infant* for loss of deceased mother's training and guidance). Recognizing this disparity, plaintiff contends that the jury properly assessed the value of the guidance provided by Joyce Mono to Lawrence Mono as equal to the value of training and guidance provided by a parent to an infant.

At the time of trial, Lawrence Mono was 29 years old and had been living in California for six years. Tr. at 414-15. He was employed as a videotape editor for NBC News in Los Angeles. *Id.* at 415. However, Lawrence Mono suffered from a learning disability and a compulsive personality disorder. Tr. at 417. He spoke with his mother at least twice a week, and sometimes as often as four or five times, "depending if [he] had a bad day." *Id.* at 416. At trial, Lawrence Mono explained the extent to which his mother assisted him in coping with his compulsive personality:

> I was concerned about germs, in the sense that if I touch something that maybe someone who was an AIDS patient touched that I was going to get AIDS or something. The fact that my mother was involved with all these health things, she would be the person to reassure me that, no there is no problem with this. She would calm me down, discuss rationally, and I would—it would bring my level down to a point where I was able to realize for myself that there wouldn't be a problem. These situations would come up in California related to, you know, somebody I brushed up against at the supermarket or something

that related to just daily walking or daily dealings with people.... I would try to rationalize it, and if I couldn't I would then contact my mom. She would usually calm me down

There were some instances—there was one incident in the beginning of '95 where I just got really, really nervous and I was calling and crying because I was afraid, and at that point it was kind of a low point for myself out in California. She was very supportive, reassured me there wasn't a problem, that I could get through this, I could· get past it, and I was able to do it. I don't think I would have been able to do it without her.

*Id.* at 417–18.

It is plain from this testimony that the guidance which Joyce Mono provided to her needy son was similar to that given by a parent to a young child. In light of the unusual extent to which Lawrence Mono depended on his mother's counseling, it would be inappropriate to compare the value of her guidance to the value of parental guidance ordinarily provided to an adult child. Nevertheless, because (1) Lawrence Mono had established a career while living across the country from his parents, and (2) Joyce Mono was 57 years old at the time of her death, it would also be improper for Lawrence Mono's recovery to equal that of an infant child deprived of decades of parental training and guidance. Given the guidance provided by *Rubin* and *Wood* ($25,000 recovery for an adult child) on the one hand and *Klos* ($250,000 recovery for an infant child) on the other hand, the damage award for Lawrence Mono's loss of parental guidance and services "deviates materially from what would be reasonable compensation." In the event that plaintiff and Lawrence Mono decline to stipulate to a reduced amount of $75,000 for loss of parental guidance, defendants are entitled to a new trial on the issue of Lawrence Mono's damages for loss of parental guidance and services.

2. *Award of $324,000 to Henry Mono for Lost Earnings*

 Defendant also challenges the $324,000 award to Henry Mono for lost earnings.

The starting point for measuring the value of past and future lost earnings is the decedent's gross income at the time of death. *Johnson v. Manhattan & Bronx Surface Transit Operating Auth.*, 71 N.Y.2d 198, 524 N.Y.S.2d 415, 418, 519 N.E.2d 326 (1988) (citing *Woodling v. Garrett Corp.*, 813 F.2d 543, 557–58 (2d Cir.1987)). The extent to which a plaintiff would have benefitted from the decedent's earnings is then determined based on numerous factors, including the decedent's age, health, life expectancy, earning capacity, character, and the circumstances of her distributees. *See Greenspan v. East Nassau Med. Group*, 204 A.D.2d 273, 611 N.Y.S.2d 580, 581 (2d Dep't 1994).

 A jury may properly consider expected changes in the decedent's future earnings where it is probable that such changes were forthcoming. *See Wanamaker v. Pietraszek*, 107 A.D.2d 1020, 486 N.Y.S.2d 523, 525 (4th Dep't 1985); *see also Marigliano v. City of New York*, 196 A.D.2d 533, 601 N.Y.S.2d 161, 164 (2d Dep't 1993) (reducing recovery by parents of decedent based on assumption that 24 year-old son would have gotten married and left home and thus decreased the financial support provided to his parents). Damages for wrongful death are not recoverable when they are based on contingencies which are "uncertain, dependent on future changeable events· and, thus, inherently speculative." *Farrar v. Brooklyn Union Gas Co.*, 73 N.Y.2d 802, 537 N.Y.S.2d 26, 533 N.E.2d 1055 (1988). Nevertheless, "[w]hile there can be no certainty of such proof in a wrongful death action, the evidence may be received if there is sufficient probability of [the] decedent's future earnings." *Wanamaker*, 486 N.Y.S.2d at 525.

 At trial, Henry Mono explained that his wife had worked full-time as a bookkeeper at Fuchs & Catrell from 1986 through October 1994. Tr. at 436. While employed at the firm, she attended Marymount College and received a bachelor's degree in accounting in 1991. *Id.* Her purpose for obtaining the degree at age 52 was to enhance her earning capacity. *Id.* at 437. The need for increased income was driven, in part, by outstanding school loans that she and her husband had incurred in paying for her col-

lege tuition and for his law school education, which he completed in 1989. *Id.* at 425–26, 437–39.

In the fall of 1994, Fuchs & Catrell went out of business. *Id.* at 439. Joyce Mono did not look elsewhere for full-time employment, but instead decided to work as a "freelance" bookkeeper. *Id.* at 439–40. She hoped that by doing freelance work, she could earn as much money as she had earned at Fuchs & Catrell and possibly work fewer hours. *Id.* at 440, 443, 445. If, after two years, she did not achieve her income goal, she intended to find a full-time job as a bookkeeper. *Id.* at 450, 452; *see also id.* at 407 (testimony of Judge Helen Freedman, a friend of the deceased).

At trial, plaintiff called an economist, Conrad Berenson, to testify concerning the income that Joyce Mono would likely have earned had she not died in the bus accident. Berenson provided the jury with detailed calculations showing that (1) if Joyce Mono had continued to work from home and earn her 1996 salary until age 65, then her lost earnings could be as much as $28,245; (2) if she had continued to work from home and earn her 1996 salary until age 70, then her lost earnings could be much as $51,993; (3) if she had obtained outside employment as a full-time bookkeeper until age 65, then her lost earnings could be as much as 156,000; and (4) if she had obtained outside employment as a full-time bookkeeper until age 70, then her lost earnings could be as much as $313, 000.[4] Tr. at 322–23, 327–28.

■■■■■ Defendants argue that the Court erred in permitting Berenson to testify regarding Joyce Mono's future earnings as a full-time bookkeeper. According to defendants, this testimony was overly speculative because Joyce Mono had not worked full-time during the two years preceding her death. In support of this argument, defendants rely on two wrongful death cases: *Morales v. City of New York,* 115 A.D.2d 439, 497 N.Y.S.2d 5 (1st Dep't 1985), and *Wanamaker v. Pietraszek, supra.* In *Morales,* the court held that testimony that the decedent

had intended to attend automobile mechanics school and then to open a car repair shop did not provide a sufficient basis for granting a $500,000 award for his loss of earnings. The forecast of his future employment was "pure speculation" and was belied by the fact that the decedent had not earned more than $6,000 in any of the thirteen years preceding his death. 497 N.Y.S.2d at 6.

The decedent in *Wanamaker* was enrolled as a full-time student at a two-year college at the time of his death. Though he had previously been employed by Airport Gypsum, a company which sponsored the college education of its employees, the decedent was scholastically ineligible for this program. To show the decedent's potential for future earnings, plaintiff introduced the testimony of an employee who had participated in Airport-Gypsum's college education program, received a bachelor's degree in business accounting, was working toward his master's degree, and had been promoted to the rank of plant manager, earning an annual salary of $62,000. The court held that the trial court had erred in admitting this testimony because the witness' salary level was "completely nonprobative of decedent's future earning capacity." 486 N.Y.S.2d at 524.

These cases are distinguishable from the case at bar. In *Morales,* the jury was left to speculate on the likelihood of success of a business that the decedent had dreamed of one day establishing, and in *Wanamaker,* the jury was permitted to consider the income of an individual with entirely different employment prospects than the decedent. In contrast, plaintiff in this action presented sufficient evidence from which the jury could reasonably conclude that Joyce Mono would have returned to full-time employment if her freelance work did not produce as much income as she had previously earned. Moreover, Berenson's projection of Joyce Mono's income as a full-time bookkeeper was derived from her past earnings as a bookkeeper. Thus, Berenson did not speculate on whether her freelance business might flourish, nor were his projections derived from

---

4. In his calculations, Dr. Berenson adjusted Joyce Mono's future income based on expected inflation rates and reduced her income by the amount of her estimated personal consumption. *See* Tr. at 322–28.

the earnings of dissimilar individuals. Rather, Berenson's calculations were grounded in historical data of Joyce Mono's earnings. Accordingly, it was not error to admit Berenson's testimony concerning Joyce Mono's future income as a full-time bookkeeper.

Defendants also challenge the portions of Berenson's testimony which assumed that Joyce Mono would work until age 70. However, this assumption was supported by the testimony of Henry Mono and Judge Helen Freedman. According to Henry Mono, his wife obtained her accounting degree at age 53 for the purpose of gaining more income, and she wanted to return to work full-time at age 58 if her business did not produce an adequate income stream. Tr. at 450–52. Judge Freedman, a long-time friend of Joyce Mono's, also testified that within two months of her death, the decedent discussed her intention to work full-time if her freelance business did not succeed and she never once mentioned retirement. Id. at 407. In light of this testimony, the jury could reasonably have concluded that Joyce Mono would have worked full-time for at least thirteen more years. Therefore, it was proper to admit Berenson's testimony which assumed that the decedent would work full-time until age 70.

### 3. Award of $378,000 to Henry Mono for Loss of Services and Guidance

■ Finally, defendants challenge the $378,000 award to Henry Mono for his loss of services and guidance. At trial, plaintiff testified that before his wife's death, she performed such household chores as shopping for poultry and fish, preparing meals, cleaning dishes, washing laundry, and vacuuming their home. Tr. at 431–32. She also calculated the couple's budget and planned their finances. Id. at 435. Henry Mono bought vegetables, fruit, and bread and did some housecleaning himself. Id. at 431–32. In all, Henry Mono estimated that he and his wife each performed approximately two hours of household work per day, and stated that the chores had been evenly divided between them. Id. at 432, 434. Following his wife's death, Henry Mono performed her chores

himself because he "did not want to bring anybody in." Id. at 433.

Defendants contend that because Henry Mono did not hire anyone to perform Joyce Mono's chores, he did not suffer pecuniary harm from the loss of her services. In support of this argument, defendants cite to Schultz v. Harrison Radiator Div. Gen. Motors Corp., 90 N.Y.2d 311, 660 N.Y.S.2d 685, 683 N.E.2d 307 (1997). In Schultz, plaintiff had been awarded damages compensating him for the loss of household services which he would have performed had he not been injured. However, while he was injured, plaintiff did not incur any additional expenses for household services, but instead relied on the gratuitous assistance of relatives and friends. The Court of Appeals held that the jury award was improper because plaintiff did not incur any actual expenditures for household services. 660 N.Y.S.2d at 689.

■ In a wrongful death action, "the standard by which to measure the value of past and future loss of household services is the cost of replacing the decedent's services." Klos, 659 N.Y.S.2d at 99 (citing De Long v. County of Erie, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983)); see also Klein v. New York State Thruway Auth., 220 A.D.2d 486, 632 N.Y.S.2d 184, 185 (2d Dep't 1995). Thus, courts use replacement cost as a means of calculating the monetary value of the lost services. See Gonzalez, 555 N.Y.S.2d at 108 (damages recoverable in wrongful death action "are occasioned by the economically recognized and calculable losses of the household management services of a mother"). No court has held that recovery for lost services in a wrongful death action requires that the plaintiff actually hire someone to perform the decedent's services.

Moreover, unlike the plaintiff in Schultz, Henry Mono has suffered some harm from the loss of his wife's household services: He must now perform the chores that she previously provided for him. The pecuniary value of Joyce Mono's household services properly quantifies the burden that Henry Mono incurs in performing these chores. For these reasons, the holding of Schultz is inapplicable to this wrongful death action. Accordingly, the jury did not err in awarding damages to

Henry Mono for the loss of his wife's household services, though he now performs the chores himself.

Nevertheless, the $378,000 award to Henry Mono for the loss of his wife's household services was excessive. Conrad Berenson, plaintiff's economist, estimated the value of the household services that Joyce Mono would have provided to her husband if she had survived. Tr. at 328–35, 362–66. Based on his assumption that Joyce Mono provided her husband with 18 hours of labor each week, Berenson calculated the value of her future services to be between $317,000 and $387,000. Tr. at 333, 363. This assumption of 18 hours per week was not supported by any evidence presented at trial. The only testimony on the issue was that Joyce Mono performed household services for approximately two hours each day, i.e., 14 hours per week. Consequently, the award for Henry Mono's loss of household services "deviates materially from what would be reasonable compensation" to the extent that it exceeds $301,000. In the event that plaintiff declines to stipulate to the reduced amount, defendants are entitled to a new trial on the issue of Henry Mono's damages for loss of household services.

## IV. Conclusion

For the reasons discussed above, defendants' motion to set aside the verdict and for a new trial based on the sufficiency of the evidence is denied. Defendants' motion for a reduction in the jury award is granted in part and denied in part. If plaintiff and Lawrence Mono decline to stipulate to a reduction of Lawrence Mono's award for loss of parental guidance to $75,000, defendants shall be entitled to a new trial on the issue of these damages. Similarly, if plaintiff declines to stipulate to a reduction of his award for loss of earnings to $301,000, defendants shall be entitled to a new trial on these damages. If plaintiff stipulates to a reduction of damages, the stipulation must be filed with the Court no later than August 6, 1998.

SO ORDERED.