OPINION OF THE COURT
Judith A. Hard, J.
Claimant Kevin J. Phelan brings this negligence claim for the *153 wrongful death of his former spouse, Nancy Phelan (hereinafter decedent).[1] The claim alleges that decedent, who was not wearing a helmet, rode her bicycle over a depression in a road in Thompson Lake State Park, lost her balance and fell, striking her head on the road. She was dead within five minutes. It is alleged that the death occurred as a result of defendant’s negligence in the design, construction, maintenance, and repair of the road where the accident happened. As a result of this wrongful death, the claim seeks damages for the loss of parental guidance, financial support and household services for decedent’s two children, William and Allison, and reimbursement for her medical and funeral expenses. The claim also seeks compensatory damages for decedent’s conscious pain and suffering, including preimpact terror, and the negligent infliction of emotional distress upon William, who observed his mother’s accident at the age of 11.[2]
Defendant alleges the following defenses: the culpable conduct of decedent and William Phelan; third-party negligence; assumption of risk; and defendant did not owe a duty of care to claimant pursuant to the doctrine of recreational use codified at General Obligations Law § 9-103.
After a five-day trial, the court determines that claimant carried his burden and established that defendant was negligent in the maintenance and repair of the road where the accident occurred, and that defendant did not prove any of its alleged defenses. For the reasons set forth below, the court makes the following award: a total of $2,437,112 for the children’s loss of services, support, and guidance; $7,122.17 for funeral and medical expenses; and $25,000 for the negligent infliction of emotional distress.
Facts
At trial, claimant presented two eyewitnesses to this tragic accident, William Phelan and Joanne Sheldon. William recounted that his family was on a week-long camping trip at Thompson Lake State Park when his mother died on August 2, *154 2001. That sunny day, decedent, William, Allison and their dog, Kelly, were enjoying a day at the beach. During the midafternoon, William and his mother rode their bikes to escort Allison to the nature center within the park. They had intended to ride their bicycles back to the beach. Although they had worn their helmets on other occasions during this camping trip, neither was wearing a helmet at this time.
It was during the course of the return trip that the accident occurred. They were heading down a hill on Loop A near campsite 23 on a paved road (exhibits 5, 36). William was three to four bike lengths directly behind his mother, who had never ridden on this road prior to the accident. Decedent was riding on the right side of the road approximately one to two feet from the edge of the road. William testified that his mother rode her bicycle over the center of a “pot hole” in the road (exhibits 1, 6), and then he saw her handlebars suddenly turn to the right. Her hands remained on the handlebars. After the turn, the bicycle kept moving to the right. It remained on the roadway for a while but eventually one tire went off the road, and his mother fell. He could not estimate how far beyond the depression her bicycle traveled before she fell.
After the fall, William stopped his bike two bike lengths in front of her, and he saw her lying on the ground. He became nervous and he rode his bicycle to the main park entrance to inform an employee of the accident. He then rode to the nature center to pick up his sister. They returned to the accident scene where the ambulance already had arrived. After the ambulance departed, they waited at a campsite for their father to pick them up. When they arrived at the hospital, they were informed that their mother was dead. They viewed their mother before returning home.
In addition to William’s testimony, claimant also offered the testimony of another eyewitness to the accident, Joanne Sheldon. She testified that midafternoon on the day of the accident, she was seated atop a picnic table at campsite 23 and facing Loop A. Sheldon observed decedent riding her bicycle along the roadway for approximately 20 to 30 feet before she eventually fell. She observed that decedent was wearing a bathing suit, shorts and sandals. Sheldon approximated that decedent was riding at a speed of 5 to 10 miles per hour down an incline with a curvature in the roadway, and that she rode over a depression in the road (exhibits 1, 2, 6). Her handlebars jerked and turned. She lost her balance. Decedent tried to regain control of the *155 bicycle as she continued to move (T at 32).[3] She fell over to her left side and struck the left side of her skull on the road. Her left leg was underneath the bicycle and her right leg was on top of the bicycle. Earlier that day, Sheldon had observed children on scooters fall at the same location.[4] 5Sheldon could not remember where decedent fell, but she did remember the location of the “groove” on the pavement that caused decedent’s fall (T at 42).
Sheldon immediately went over to decedent, who was bleeding profusely and gurgling on her own blood. Decedent tried to lift her head and her back leg was moving slightly. Sheldon told her not to move because help was on the way. Within five minutes, decedent developed a gaze and then a blank stare on her face. At that point, she stopped moving. Sheldon checked for a pulse, but could not locate one. Lifeguards from the park beach arrived six to seven minutes later. Eventually, an ambulance removed decedent from the park and brought her to a hospital where she was pronounced dead upon arrival (exhibit 31).
Decedent’s former husband, claimant Kevin Phelan, testified that he was informed of the accident by the park police. He picked up his children at the campground and was escorted to the hospital by the park police. When they arrived, they were informed that decedent had died. At approximately 7:00 p.m. that evening, Phelan returned to the park to break down the campsite. At the accident site, he observed that a 12-inch corrugated pipe passed under the roadway (exhibits 2, 54). In Phelan’s opinion, the stone material that packed the pipe had collapsed.[5] He observed that the roadway had sunk several inches in places on the road. The next morning he returned to the site and found that crushed stone had been placed in the depression (exhibits 18-20, 22-23).[6] After the accident, Phelan had several discussions with State Police Senior Investigator James Dolan, who opined that the hole in the road was the cause of the accident. Dolan inspected decedent’s bicycle and *156 found nothing wrong with it. Neither the State Police report nor the park police report, however, make a determination as to the cause of the accident (exhibits 34, 35).
The manager of Thatcher State Park, Christopher Fallon, also testified at trial. His responsibilities included the oversight of Thompson Lake State Park, and he testified that there was no rule at the park that bicyclists over the age of 14 wear a helmet. Fallon testified at his deposition that he had not observed the depression at any time before the accident, but he was aware of the culvert since he would tour the campground daily. He later testified in the same deposition, however, that although he was aware of the depression before the accident, he did not request that repairs or modifications be made. Although maintenance was conducted on an observed, as needed basis, there was no scheduled maintenance for this depression.[7] Fallon also admitted that he had observed the culvert several times before the accident, possibly even the morning of the accident. Upon cross-examination, Fallon testified that he searched park records and found no documents regarding prior accidents at this location. Further, he had not received any complaints about this location while he was park manager.
Fallon was informed of decedent’s accident over the park radio system. He drove to Thompson Lake State Park and found her on Loop A, five feet from the edge of the road near one of the campsites between the shower building and the beach (exhibits D-H). Upon voir dire, however, he admitted that he was not completely sure where decedent’s body was located immediately after the fall.[8] By the time he arrived, the lifeguards were attending to her. She appeared to be unconscious and there was a large pool of blood around her head. After the ambulance departed, the area was hosed down and bleached.
During the trial, the parties each offered expert testimony to support their respective theories of the cause of decedent’s accident. Claimants theorized that a large depression in the road caused by negligent maintenance and/or repair caused decedent *157 to lose her balance and ultimately fall. Defendant countered that based on the location where decedent fell, the depression did not cause her fall.
Alan Gonseth,[9] a civil engineer and bicycle accident reconstructionist, testified on behalf of claimant and inspected the accident scene the morning after it occurred. Gonseth described the road as a 24-foot-wide asphalt pavement without any markings. It slopes downward at a grade of approximately 8.1% (exhibit 1). He observed the road located across from campsite 23 as having three depressions with the largest located along the right edge of the pavement (exhibit 6). He found a model admitted during trial, depicting the road where the accident occurred, to be an accurate depiction of this depression (exhibit 55). The remaining two depressions were located in the middle and left side of the road (exhibit 17). He also observed that there had been major repair work to the depression on the right side where a triangular piece of road had been cut out and patched. It was located at the edge of the pavement where a culvert ran underneath it (exhibit 2). He opined that the packing around the culvert was not done properly, so that when it settled, it left a void underneath the road. Weight on the road eventually caused the road to fall into that void. Gonseth believed that the triangular piece was cut to fix that area but it was not packed properly, causing the roadway to sink (exhibit 6). Gonseth measured the depth of the depression as 3.5 to 4 inches in the center, on top of the fill that had been placed in it after the accident (exhibits 18-20). He opined that it would be difficult to see the patched area on any approach from the north or south. He further opined that a cyclist going down the grade of this hill at a reasonable rate of speed, who encountered a depression like this one, could easily lose his or her balance and fall.
James Green, a licensed civil engineer, testified on behalf of defendant.[10] His testimony was often vague and, when it was coherent, it was unpersuasive due to his broad brush opinions without explaining the premise for such assertions. His de *158 meanor was irreverent, sometimes discourteous to opposing counsel, and the court finds that he was generally not credible. In his opinion, if decedent fell as depicted by the eyewitnesses, then she should have fallen closer to the depression. In reaching this opinion, Green relied on a State Police accident report that contains a diagram that indicates a distance of 41.2 feet from the depression to a location purporting to be where decedent landed (exhibit 34). Green concluded, therefore, that the eyewitness accounts of the accident were not accurate (T at 719). The court does not credit Green’s opinion inasmuch as no witness with personal knowledge was produced to testify as to the reliability of the diagram, or the measurements contained therein. Specifically, no witness was produced indicating when the measurements were taken or whether the person who took the measurements observed decedent’s location.
He alluded to a theory of kinetics to explain his proposition but never sufficiently explained the theory at trial.[11] He testified that the seat of decedent’s bicycle, with the nose of the seat extremely high, was not set up properly and made the bicycle unstable. Upon cross-examination, however, Green admitted that he did not have specific knowledge of Regulations of the Consumer Product Safety Commission (16 CFR) § 1512.2 (f), which provides that the seat and handlebars of a bicycle may be adjusted to positions judged by the rider to be comfortable. He believed that decedent should have worn a helmet as it would have dissipated the force of the fall,[12] yet he admitted on cross-examination that the capability of a helmet to prevent injury was still being studied by the engineering community, and that a cyclist could sustain traumatic brain injuries even if he or she were wearing a helmet.
Green also opined that Gonseth’s measurements of the depression were deceiving since his measurements were taken on the part of the depression that extended off the road (exhibit *159 Q). The court does not agree inasmuch as it credits William’s testimony that his mother’s bicycle tire hit the center of the depression on the road (exhibit A), and Gonseth measured this depression as almost four inches deep (exhibit 22).
Green opined that even if the accident occurred as theorized by claimant, the depression could be easily seen from 100 feet away. He stated that he visited the accident scene the afternoon before testifying, and noted that there was an oak tree and a post by the culvert under the accident scene.[13] He described the post as two feet away from the culvert (exhibit 5). The court does not credit this testimony as during cross-examination, upon learning that Phelan had been to the accident scene 36 hours later and did not see a post, Green said he had misspoken on direct examination when he testified that the post was there. He really relied on a State Trooper’s knowledge of the location when he was measuring the distance, and that he saw the part of the road as depicted in exhibit 6, except that it was covered by “three feet of snow” (T at 693).[14]
Green also suggested that decedent was riding the bicycle using the toe clips, and this prevented decedent from avoiding the fall because she was unable to drop one of her feet to the ground to steady herself after she lost her balance. Green opined that decedent must have been riding the bike using the toe clips, since it would have been impossible to ride the bike with her feet resting on the clips. The court is unpersuaded inasmuch as Green demonstrated his theory by riding her bicycle with flat tires on a carpet in the courtroom (exhibit M). Further, there was no testimony that decedent was using the toe clips on the bike that fateful day. Indeed, Green later testified on cross-examination that he did not know if decedent was wearing toe clips.
To support its theory of the accident and establish where decedent fell, defendant called four witnesses who responded to *160 the accident, one of whom was Bohdan Pakosz, a state park police sergeant. Using a photograph of the accident location, he identified where decedent’s body was located when he arrived, and marked the location of her body (exhibit D). During cross-examination, however, he admitted that he did not see where decedent’s body first impacted the pavement, and he did not take any measurements of the accident scene. Indeed, Pakosz’s report states: “Inspection of the scene did not reveal an exact accident location or point of impact” (exhibit 35, at 6).
Stephanie Conklin, a lifeguard working at the beach that day, also testified. She stated that when she arrived at the accident scene, decedent was not moving and there was blood coming from her mouth and nose. Conklin also marked photographs depicting the accident scene for the general location of where decedent’s body was located (exhibits G, I),[15] and she also did not take any measurements that day. Ryan Johnson, the chief lifeguard that summer, testified that when he arrived the other lifeguards were placing decedent on a backboard. Since there was a lot of blood on the ground, he cleaned the area with bleach. He marked one of the same photographs used by Conklin to depict where he believed, although he was not certain, decedent’s body was located (exhibit I).[16] He took no measurements that day and he did not know if decedent had been moved prior to his arrival.
Lastly, Rachel Saddlemire was another lifeguard who responded to the scene of the accident. When she first arrived, decedent was lying diagonally on the ground on her left side with her torso and head on the pavement. Her legs, still in the position as if she was riding the bicycle, were on the gravel area of the road. Her head was turned to the left. A stream of blood ran from her head onto the pavement and into the gravel area (exhibit E). The lifeguards performed resuscitation and moved her to a backboard. She was uncertain as to how much time elapsed between the time the accident happened and the time she arrived at the scene.
In support of damages, claimant offered testimony regarding decedent, particularly her relationship with her children, income and plans for the future. William recalled his mother as picking him up at school when needed, having a snack ready for him when he got home, and doing his laundry. She helped him with *161 his homework, taught him good manners and how to bake. He helped decedent garden, attended church with her on Sundays, and they went on vacations. After his mother’s death, William and his sister attended a limited grief counseling program. William is also in an individualized educational program at school which provides additional assistance to students.
Phelan testified his former spouse was a very warm individual who made friends easily. Earlier in life she attended two colleges but did not receive a degree. Prior to her death, she was very near completion of an Associate’s degree in restaurant and hotel management from Schenectady County Community College. She loved to bake and hoped to open a bakery in her hometown. She even maintained a business plan notebook, containing many notes, business cards and draft letters for loans.[17]
She maintained her bicycle and the children’s bicycles once a year. Decedent was very active with the PTA, was available for school field trips or to help during a classroom party. She was active with her daughter’s Brownie Girl Scout troop and encouraged her to cheerlead for Pop Warner football. She celebrated holidays, including birthdays, with decorations and parties. Her home was always clean and smelled of good cooking, with music playing.
Regarding decedent’s work history, she worked in restaurants, a bakery and a nursery.[18] After she and Phelan married, she took care of children and the elderly in their homes. She also worked in a school cafeteria. After they had a family, Phelan stated decedent did not work. Just prior to their separation, she returned to work in a school cafeteria and at a nursery. Decedent was employed by Price Chopper supermarket in 2000, Seattle Sub and Pita in 2000, and Tutor Time Learning Systems (year unknown) (exhibits 13, 14). In the final year of her life, she also worked for an elderly couple.
Several witnesses who were personal friends of decedent also testified. Charlene Hesse knew her because their daughters were in the same kindergarten class and were Daisy Girl Scouts. Decedent and Hesse were coleaders of their Brownie Girl Scout troop. Decedent did all the camping and overnight trips with *162 the troop. She was the troop leader every other week until the time of her death. Hesse even wrote a character reference letter on decedent’s behalf when she was applying for a loan to open a business.[19]
Jan McCracken, a friend of decedent since the sixth grade, testified that she was attending Schenectady County Community College in the culinary arts program at the time of her death. Decedent worked in many jobs, including restaurants, bakeries, gardening and landscaping, and domestic work throughout her life. She shared with McCracken the business plan notebook for a bakery (exhibit 15). McCracken also wrote a character reference letter for decedent to further her goal of getting a business loan.
Katherine McCarthy met decedent when their sons became friends in the third grade. She described her as an attentive mother who walked her children to school and frequently met them after school. She was also very involved in school activities such as fund-raising for school trips. The Phelans would ride their bikes to town with the McCarthy family, and decedent’s interaction with her children was always warm and positive. McCarthy, a reporter for a local newspaper, wrote an article about decedent’s aspiration to open a bakery in her hometown.[20]
In this regard, Anthony Strianese, a professor and chairperson of the Hotel, Culinary Arts and Tourism Department at Schenectady County Community College, testified that decedent had 69 credits in this program (T at 406). She had been named to the President’s List for achieving a grade point average of 3.7 or higher (exhibit 53), and she only had one or two courses to complete before obtaining her degree.
Finally, claimant offered the testimony of economist James Lambrinos.[21] He calculated three categories of economic loss due to decedent’s death: lost earnings, loss of household services to her children, and medical and funeral expenses. As *163 for lost earnings, he assumed that the loss would accrue only until the youngest child reached the age of 21. The court admits the two methods used by Lambrinos to calculate decedent’s lost earnings (exhibit 58). The first method was based upon $8,100, her actual part-time earnings in the year prior to her death (exhibits 13, 14). Based on this method, decedent’s past lost earnings were $12,898, and the future lost earnings were $78,708 (T at 433). The second method was based upon $18,296, the earnings decedent would have earned had she become a full-time baker. The past lost earnings based upon this method was $29,133 (T at 434), and the future lost earnings were $177,785 (T at 434).
Lambrinos also calculated the loss of household services for decedent’s children. In this calculation, he factored in the age of the children, that decedent was the primary caretaker, and that she was employed part time. He estimated the value of the services she performed for herself as 15% and deducted such amount from the totals. He found that the past loss of household services was a total of $21,082 (T at 441), and the future loss of household services, using a 2.5% inflation rate, was a total of $124,424 (T at 443).[22]
The total economic loss, excluding costs for decedent’s funeral and medical treatment (exhibits 29-30), with lost earnings based upon $8,100, was calculated as $237,112 ($33,980/past and $203,132/future [T at 450]). With lost earnings based upon $18,296, the total economic loss was calculated as $352,424 ($50,215/past and $302,209/future [T at 451]).
Upon cross-examination, Lambrinos admitted that he had no personal information that decedent would be employed as a baker after her death or that she was making inquiries for a position as a baker. Lambrinos assumed that decedent would work for another employer and not embark upon a sole proprietorship. It is noted that defendant did not offer expert testimony with respect to damages.
Discussion
As previously stated, claimant argues that defendant’s negligent repair of the roadway caused the depression that led to decedent’s accident and death. Defendant counters that the depression did not cause decedent’s fall and even if it did, *164 decedent assumed the risk of injury.[23] Thus, to begin, claimant must establish by a preponderance of the credible evidence that defendant’s negligence was the proximate cause of decedent’s injuries (see e.g. Burgos v Aqueduct Realty Corp., 92 NY2d 544, 550 [1998]). Although claimant contends that a lesser burden of proof is applicable under the Noseworthy doctrine, the court disagrees.
The Noseworthy doctrine permits a “relaxed burden of persuasion” where a victim cannot provide his or her account of the accident (see Alber v State of New York, 252 AD2d 856, 857 [3d Dept 1998]; Ether v State of New York, 235 AD2d 685, 687 [3d Dept 1997]), and has been applied in cases with eyewitnesses (see Schechter v Klanfer, 28 NY2d 228 [1971]; Swensson v New York, Albany Despatch Co., 309 NY 497 [1956]). The doctrine does not apply where a claimant and defendant have equal access to the facts surrounding the decedent’s death (see Orloski v McCarthy, 274 AD2d 633 [3d Dept 2000], lv denied 95 NY2d 767 [2000]; Walsh v Murphy, 267 AD2d 172 [1st Dept 1999]; Gayle v City of New York, 256 AD2d 541, 542 [2d Dept 1998]; Wright v New York City Hous. Auth., 208 AD2d 327, 332 [1995]). Although defendant does not oppose the application of the Nose-worthy doctrine, the court is unpersuaded that it applies as the parties had equal access to the two eyewitnesses to the accident, Joanne Sheldon and William Phelan, and defendant did not have any other evidence to explain how this accident occurred. Thus, claimant must establish by a preponderance of the credible evidence that defendant’s negligence caused decedent’s death. Based on the foregoing, the court determines that claimant has carried this burden.
Negligent Repair
“As a landowner, the State has a duty to use reasonable care under the circumstances in maintaining its property in a safe condition” (Colangione v State of New York, 187 AD2d 844, 845 [3d Dept 1992], quoting Basso v Miller, 40 NY2d 233, 241 [1976]). The duty to exercise reasonable care requires that the State, as the owner and operator of a recreational area, protect the public from foreseeable risks of harm (see Basso v Miller, *165 supra). Like any other landowner, however, the State is not an insurer of the safety of those using the property for recreational purposes, and the mere happening of an accident does not render the State liable (see Paul v Kagan, 92 AD2d 988 [3d Dept 1983]).
Next, latent hazards give rise to a duty to warn entrants and protect them from that danger (see Tagle v Jakob, 97 NY2d 165 [2001]; Soich v Farone 307 AD2d 658, 659 [3d Dept 2003]). Even where the condition is open and obvious, a landowner’s duty to maintain-property in a reasonably safe condition is not obviated; it merely negates the requirement to warn of such a condition (see MacDonald v City of Schenectady, 308 AD2d 125 [3d Dept 2003]). In either case, however, a claimant must still demonstrate that the risk of harm was foreseeable because the State had actual or constructive notice of the condition and failed to act reasonably to remedy it (see e.g. Morrow v Ashley, 3 AD3d 619, 620 [3d Dept 2004]). Where the landowner creates the dangerous condition that causes the accident, the landowner is deemed to have actual notice of such condition (see Lewis v Metropolitan Transp. Auth., 99 AD2d 246, 249 [1st Dept 1984], affd 64 NY2d 670 [1984]).
Here, the court credits Gonseth’s testimony that a major repair had been undertaken at the depression located on the right side of the park roadway located near campsite 23. The court also credits the testimony of William and Sheldon that decedent’s bike tire hit this depression and caused her to lose her balance and fall. Gonseth was persuasive that the repair was negligently undertaken in that it was not properly packed, thereby causing a sinking of the road, creating a depression.
The only witness that defendant produced about its maintenance of this road was Christopher Fallon. He contradicted his original testimony and admitted that he passed the depression and the culvert frequently and that he was responsible for the repair budget. As can be seen from the many exhibits displaying the triangular depression in the roadway, it had been repaired. Defendant offered no proof regarding how many times it was repaired, by whom or with what materials. This is noteworthy since “[significance must be given to the failure of the State to rebut the testimony of claimant’s engineer that the path was not constructed in accordance with good practice” (Nichols v State of New York, 286 App Div 281, 283 [3d Dept 1955]). Further, by the testimony of Fallon, defendant had knowledge of the depression, and in any event is deemed to have actual notice *166 of this condition, since defendant created it, and yet defendant failed to remedy it. The court further determines that this depression was a latent hazard based upon the testimony of Sheldon and Gonseth that it was on an incline with a curve, thereby making the depression difficult to see.
Based on the foregoing, the court determines that claimant has established a prima facie claim by demonstrating that the depression was a latent dangerous condition created by defendant, that defendant not only failed to warn decedent of this condition but also failed to remedy it, and that this condition caused decedent’s fall and subsequent death. As such, the court turns its attention to defendant’s affirmative defense of assumption of risk. Defendant contends that this doctrine is a complete bar to recovery where, as here, a claimant is participating in a sport. The court does not agree.
Assumption of Risk
Assumption of risk encompasses two distinct doctrines. The first is akin to comparative negligence and does not bar recovery, but reduces recovery in the proportion to which a claimant’s culpable conduct contributed to his or her injuries (see Lamey v Foley, 188 AD2d 157 [4th Dept 1993]; CPLR 1411). Here, the court is concerned with the second doctrine, referred to as primary assumption of risk (Lamey, 188 AD2d 157). It is not a measure of comparative fault, but a measure of the defendant’s duty of care (id.). Comparatively, primary assumption of risk generally serves as a complete bar to recovery when a claimant’s injury results from the voluntary participation in a recreational activity (see Connor v Tee Bar Corp., 302 AD2d 729 [3d Dept 2003]). “It is well settled that a voluntary participant in a sport or recreational activity ‘consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation’ ” (id. at 730, quoting Morgan v State of New York, 90 NY2d 471, 484 [1997]). A participant will not be deemed to assume the risk, however, if the risks “were unique and resulted in a dangerous condition over and above the usual dangers inherent in the activity” (Connor, 302 AD2d at 730, quoting Rios v Town of Colonie, 256 AD2d 900 [3d Dept 1998]).
Factors to consider in the determination of whether a claimant assumed the risk are: the “openness and obviousness of the risk, [claimant’s] background, skill, and experience, [claimant’s] own conduct under the circumstances, and the nature of defendant’s conduct” (Lamey, 188 AD2d at 164). The *167 most important factor is whether the risk is inherent in the activity (see id.). Applying these factors to the testimony presented, the court determines that the depression was not open and obvious, and claimant, a recreational bicyclist, who had not traveled on the roadway previously, did not assume the risk of encountering this type of unwarned hazard. In making this determination, the court is mindful of Furgang v Club Med (299 AD2d 162 [1st Dept 2002], lv denied 99 NY2d 504 [2003]). In Furgang, the Appellate Division, First Department, stated that the risk of encountering ruts and bumps while riding a bike over a rough roadway without a helmet should be obvious to the experienced cyclist, and that a plaintiff assumes any risk inherent in that activity (id.). The court distinguishes this case in that a depression caused by a sinking repair is not an ordinary rut or bump in the roadway, which is ordinarily caused by travel upon the road. Further, the decedent was a recreational bicyclist who had not previously traveled the road.
The court also distinguishes Dobert v State of New York (8 AD3d 873 [3d Dept 2004]). In Dobert, claimant admitted that she saw the crevice in the road before she encountered it. Here, defendant presents no evidence that decedent saw the depression. Moreover, after reviewing all the photographs of the accident scene, the court determines that the depression caused by the negligent repair was not discernable due to the decline and curve in the road. Thus, the court is unpersuaded by defendant’s argument that decedent consented to this risk inasmuch as the risk was hard to see and was unknown to decedent since she had not previously bicycled on that road. As such, claimant ‘s recovery is not barred by assumption of risk. Accordingly, the court finds that claimant has established his claim by a preponderance of credible evidence and next considers the issue of damages.
Damages
Wrongful Death
Initially, the court declines to mitigate any damage award for decedent’s failure to wear a helmet at the time of the accident. Decedent was not required to wear a helmet (see Vehicle and Traffic Law § 1238 [5] [b]), and, furthermore, no persuasive testimony, medical or otherwise, was proffered to establish that her injuries would have been either avoided or reduced had she worn a helmet (see Dean v Holland, 76 Misc 2d 517 [1973]).
Next, the court declines to award damages for decedent’s alleged postimpact pain and suffering since claimant has failed to *168 prove that decedent was conscious after her fall. To establish conscious pain and suffering, a claimant must demonstrate, through direct or circumstantial evidence, some level of awareness for some period of time following an accident (see Cummins v County of Onondaga, 84 NY2d 322 [1994]; McDougald v Garber, 73 NY2d 246, 255 [1989]; Ramos v Shah, 293 AD2d 459, 460 [2d Dept 2002]). “ ‘[M]ere conjecture, surmise or speculation is not enough to sustain a claim for [pain and suffering] damages’ ” (Cummins, 84 NY2d at 325, quoting Fiederlein v New York City Health & Hosps. Corp., 56 NY2d 573, 574 [1982]). When the interval between injury and death is relatively short, “the degree of consciousness, severity of pain, apprehension of impending death, along with duration, are all elements to be considered” (Ramos, 293 AD2d at 460, quoting Regan v Long Is. R.R. Co., 128 AD2d 511, 512 [2d Dept 1987]).
Here, Sheldon provided the court with the only testimony regarding decedent’s condition after her fall. She said that decedent was gurgling on her own blood, tried to lift her head and her back left leg moved slightly. There was no evidence that she cried out in pain, made any noise in pain or sought aid following the accident (see Cummins v County of Onondaga, supra; Saguid v Kingston Hosp., 213 AD2d 770, 772 [3d Dept 1995], lv dismissed 87 NY2d 861 [1995], lv denied 88 NY2d 868 [1996]). Further, claimant does not provide any medical expert testimony that decedent had some level of awareness in the short interval between her fall and death, and the autopsy report was silent in this regard. Thus, based upon the evidence before the court, it would be mere conjecture to assign a level of consciousness to decedent for the brief interlude between injury and death.
With respect to the claim for preimpact terror, the court reaches the same result. The court credits Sheldon’s testimony that decedent struggled to regain her balance on the bicycle before she fell (T at 32). There is no testimony, however, that decedent perceived grave injury or death to be imminent (Lang v Bouju, 245 AD2d 1000 [3d Dept 1997]), and any such finding by the court would be mere speculation. Further, the nature of the accident itself does not demand such a finding. As tragic as this accident was, typically, a fall from a bicycle does not place one in apprehension that he or she is about to endure grave injury or death. As such, the court declines to make an award for preimpact terror.
With respect to pecuniary damages, Estates, Powers and Trusts Law § 5-4.3 (a) limits a claimant’s recovery for pecuniary *169 injuries resulting from decedent’s death, as there is no recovery for the loss of parental companionship (see Chong v New York City Tr. Auth., 83 AD2d 546 [2d Dept 1981]). At the time of decedent’s death, William and Allison were 11 and 9 years old, respectively, and a parent has the legal duty to support a child until he or she is 21 years old. (See, Matter of La Blanc v La Blanc, 96 AD2d 670 [3d Dept 1983]; Family Ct Act § 413 [1] [a].) Moreover, since a pecuniary advantage results from “parental nurture and care, from physical, moral and intellectual training,” the loss of these benefits may be considered within the pecuniary loss calculation (DeLong v County of Erie, 89 AD2d 376, 386 [4th Dept 1982], affd 60 NY2d 296 [1983]; see Gonzalez v New York City Health & Hosps. Corp., 98 AD2d 685 [1st Dept 1983]).
Based upon the testimony of Phelan and his son, William, together with the testimony of decedent’s friends, the court is convinced that decedent was a warm, loving mother who put the needs of her children first throughout her life. Her countless activities in this regard, volunteering at school, encouraging her children to participate in after-school activities, helping them with their homework, taking them on vacations, cooking, baking and cleaning for them and making holidays special, are evidence of her love and commitment to their well-being. The death of a mother, for a child of any age, is a great loss. The court recognizes that her parental nurturing and guidance was a tremendous loss to these young children. As such, a total of $2,200,000 is awarded to Allison and William for the loss of parental nurturing (see Bryant v New York City Health & Hosps. Corp., 250 AD2d 797 [2d Dept 1998], affd in part 93 NY2d 592 [1999] [mod in part on other grounds]; Bogen v State of New York, Ct Cl, Aug. 23, 2001, Mignano, J., Claim No. 92429, UID No. 2001-029-094, affd 5 AD3d 521 [2d Dept 2004]).
Next, evidence of a decedent’s gross income at the time of death is the standard to measure the value of income already lost and to measure the loss of future earnings (see Johnson v Manhattan & Bronx Surface Tr. Operating Auth., 71 NY2d 198 [1988]; Woodling v Garrett Corp., 813 F2d 543 [2d Cir 1987]). Expected changes in the decedent’s future earnings may be considered where it is probable that such changes were forthcoming (see Mono v Peter Pan Bus Lines, Inc., 13 F Supp 2d 471 [SD NY 1998]; Wanamaker v Pietraszek, 107 AD2d 1020 [4th Dept 1985]). “Damages for wrongful death are not recoverable when they are based on contingencies *170 which are ‘uncertain, dependent on future changeable events and, thus, inherently speculative’ ” (Mono, 13 F Supp 2d at 478, quoting Farrar v Brooklyn Union Gas Co., 73 NY2d 802 [1988]). Thus, in Morales v City of New York (115 AD2d 439 [1st Dept 1985]), the Court held that plans to open an automobile repair shop where a decedent’s work record indicated that he never earned more than $6,000 in any year, were speculative. Similarly, while decedent had hoped to be a baker and open her own bakery, the only evidence before the court was, at best, a notebook of ideas. Although her friends wrote character letters for a business loan, no application for a loan was offered into evidence. This court cannot award damages based on such speculative evidence. The court, therefore, awards damages for past and future lost earning based upon decedent’s earnings in the 12 months prior to her death and not what she would have earned as a baker.[24]
The standard by which to measure the value of past and future loss of household services is the cost of replacing the decedent’s services (see Klos v New York City Tr. Auth., 240 AD2d 635 [2d Dept 1997], lv dismissed 91 NY2d 846 [1997], lv dismissed 91 NY2d 885 [1998]). Recovery for lost services in a wrongful death action does not require that the claimant actually hire someone to perform the decedent’s services.[25] Based on the calculation provided by claimant’s economist, the court awards $21,082 for past loss of household services and $124,424 for future loss of household services.[26]
Accordingly, William and Allison Phelan are entitled to a collective award for damages for the wrongful death of their mother in the amount of $2,437,112 as follows:
*171 PAST DAMAGES
Loss of Parental Nurturing $ 800,000 ($400,000 each)
Past Lost Wages $ 12,898
Past Loss of Household Services $ 21,082
PAST DAMAGES TOTAL: $ 833,980
FUTURE DAMAGES
Loss of Parental Nurturing ($800,000/Allison; $600,000/William) $1,400,000
Future Lost Wages $ 78,708
Future Loss of Household Services $ 124,424
FUTURE DAMAGES TOTAL: $1,603,132
TOTAL WRONGFUL DEATH: $2,437,112
Negligent Infliction of Emotional Distress
A party is entitled to recover damages for the negligent infliction of emotional distress when (1) a defendant’s negligent conduct creates an unreasonable risk of bodily harm to a claimant, i.e., he or she is in the zone of danger, and (2) such conduct is a substantial factor in bringing about injuries to the claimant as a result of (3) shock or fright from his or her contemporaneous observation of serious physical injury or death inflicted by the defendant’s conduct on (4) a member of the plaintiffs immediate family in his or her presence (Bovsun v Sanperi, 61 NY2d 219, 223 [1984]). Further, “[t]he emotional disturbance suffered must be serious and verifiable [and] must be tied, as a matter of proximate causation, to the observation of the serious injury or death of the family member” (id. at 231 [citation omitted]).
While William’s observation of his mother’s accident and fear of his own potential demise are very significant emotional events, claimant did not provide the court with sufficient evidence that William’s emotional injuries were lengthy or permanent. William testified that he was nervous after the accident so he went to a park booth to seek assistance. He and his sister attended grief counseling at the Wave program until the program concluded. Although there was testimony that he is a special needs student, there was no testimony connecting his special needs to his mother’s accident. No testimony was adduced that William’s nervousness continued after his mother had died, that the grief counseling was meant to address his emotional distress *172 above and beyond that which is incurred when a mother dies, or that his problems in school were related to his observance of his mother’s death. Nonetheless, the fact that William “has not sought any medical treatment or psychological counseling for his alleged injuries, while relevant to the issue of damages, does not necessarily preclude his recovery” (Massaro v O’Shea Funeral Home, 292 AD2d 349, 351 [2d Dept 2002]). “[T]here exists ‘an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious’ ” (Johnson v State of New York, 37 NY2d 378, 382 [1975], quoting Prosser and Keeton, Torts § 54, at 330 [4th ed]). Accordingly, based on William’s testimony regarding his emotional trauma and suffering, the court awards him $25,000 for the negligent infliction of emotional distress due to the State’s negligent repair of the roadway that caused his mother’s death.
As a final matter, pursuant to EPTL 5-4.3 (a), claimant is awarded $7,122.17 for the medical and funeral costs associated with decedent’s accident as established by the record (exhibits 29, 30).
The Chief Clerk is directed to stay the entry of judgment in accordance with this decision until a hearing is held pursuant to CPLR article 50-B.[27] All trial motions not heretofore decided are now deemed denied.

. Kevin J. Phelan brings this claim individually, as administrator of the estate of decedent and as the parent and guardian of William R Phelan. For ease of reference, all references to claimant shall refer to Kevin J. Phelan in all of his capacities.

. The claim on behalf of Kevin J. Phelan for loss of consortium, due to William’s psychological injuries and for future medical and psychological treatment, is deemed abandoned inasmuch as claimants failed to offer proof at trial or raise the claim in their posttrial memorandum.

. Unless otherwise noted, all page references are to the consecutively paginated five-volume trial transcript and are preceded by “T.”

. The State Police investigation report notes a statement by another park patron that he observed two children on separate occasions fall at this location while riding their scooters (exhibit 34, at 5).

. Phelan, a geologist, was not disclosed or credited as an expert. Defendant did not, however, object to this statement.

. Defendant did not object to this statement regarding the postaccident repair.

. Exhibit 37 is not admitted into evidence since it pertains to potential subsequent repairs (see Ramundo v Town of Guilderland, 142 AD2d 50 [3d Dept 1988]). Any trial or deposition testimony of Fallon relating thereto is struck from the record.

. A photograph of the accident scene taken the next day is admitted for the purpose of indicating where Fallon believed he observed decedent’s body on the day of the accident (exhibit J). The court notes that Fallon admitted on cross-examination that he did not observe the accident and that her body had been moved after impact.

. Gonseth graduated from Clarkson University in 1956 where he obtained a degree in civil engineering, and he is a licensed professional engineer in New York. After graduation, he immediately went to work for the Port Authority of New York and New Jersey, in a position that included the maintenance of roads and culverts. He is a member of various professional organizations.

. Green is a licensed civil engineer in North Carolina. He is a member of the National Academy of Forensic Engineers and claims to be a bicycle accident reconstruction expert. He has had his own consulting business since 1981. He has worked with Duke University and Wayne State University in the *158 study of force impact to the head. He has been an input engineer for helmet standards since the mid-1970s and is a professional cyclist.

. Green claimed he was the author of a textbook entitled “Bicycle Accident Reconstruction for the Forensic Engineer.” It was supposedly marked as exhibit M; however, exhibit M is a photograph. Green never explained his kinetics theory or whether such theory has been sufficiently relied upon by experts in the field (see People v Sugden, 35 NY2d 453 [1974]; Borden v Brady, 92 AD2d 983 [3d Dept 1983]).

. Green testified that studies in his lab would verify that, in a simple fall sideways, a helmet gives 100% dissipation of force, so that the head is not injured. This testimony is not admitted since defendant failed to establish that it is generally accepted as rehable (People v Wesley, 83 NY2d 417 [1994]).

. Any testimony about postaccident modifications to the road by Green is struck.

. Green testified that he could see the location of the depression when he was at the accident scene early in the week of this trial. Approximately 36 hours later, Phelan went to the accident scene and saw snow and ice covering the depression. Within a day of Phelan’s visit, Fallon visited the accident location. Fallon’s testimony is admitted as it was proper rebuttal to Phelan’s rebuttal testimony. The court, however, does not attribute much weight to either testimony since the condition of the road, e.g., whether it was covered with snow and ice, could have changed between the time of each of these visits.

. Green markings.

. Red markings.

. The notebook is admitted over defendant’s objection (exhibit 15) (see Provenzo v Sam, 23 NY2d 256 [1968]). However, exhibit 57, which was claimed to be contained within exhibit 15, is not admitted since an identical document was not found therein.

. Defendant’s objection to this testimony is overruled.

. Hesse’s testimony about decedent’s hope to open a bakery business is admitted (see Provenzo v Sam, 23 NY2d 256 [1968], supra).

. This article is admitted over defendant’s relevancy objection (exhibit 51).

. Lambrinos is a professor of economics at Union University with an area of expertise in labor and medical economics. He has a Bachelor’s degree in economics and mathematics from Farleigh-Dickinson University. He obtained a Master’s degree and Ph.D. in economics from Rutgers University. He has published 50 professional articles, some in the area of economic forecasting. He is a member of various professional organizations.

. A rate lower than the wage inflation rate of 3.5%.

. Although defendant raised in its answer that it did not owe a duty of care to decedent pursuant to General Obligations Law § 9-103, it did not pursue this defense at trial or in its posttrial memorandum. Even if it had, the court notes that supervised public parks fall outside the immunity of General Obligations Law § 9-103 (Sena v Town of Greenfield, 91 NY2d 611 [1998]; see also Smith v State of New York, 124 AD2d 296 [3d Dept 1986]).

. The court notes defendant’s objection to the use of earnings in the 12 months prior to decedent’s death and not a calendar year, but finds the difference negligible.

. Claimant’s objection to testimony elicited upon cross-examination regarding Phelan’s services to the children is sustained. As Judge Minarik succinctly noted in LaMendola v New York State Thruway Auth. (Ct Cl, June 23, 2004, Minarik, J., Claim No. 93132, UID No. 2004-031-510), defendant’s reliance upon Schultz v Harrison Radiator Div. Gen. Motors Corp. (90 NY2d 311 [1997]) is misplaced since it concerned a personal injury action. In a wrongful death action, no proof is required that someone was hired to perform such services (see Mono v Peter Pan Bus Lines, Inc., supra).

. Defendant did not, on its own behalf, provide alternate estimates of damages through an expert economist.

. All interest calculations shall be decided pursuant to such hearing.