OPINION OF THE COURT
James H. Ferreira, J.
In this claim for negligence, claimant, a student at the State University of New York at Potsdam (hereinafter SUNY Potsdam), alleges that she suffered personal injuries on January 27, 2009 while participating in recreational swim at the Maxcy Pool, located on the campus of SUNY Potsdam, when she dove off the starting blocks and struck her head on the bottom of the pool. A trial on the issue of liability was conducted on January 24, 2011 through January 27, 2011 at the New York State Court of Claims in Utica, New York. In addition to her own testimony, claimant offered the testimony of six witnesses including William Beauchamp, director of intramurals and recreation at SUNY Potsdam; Meghan McCrimmon, senior lifeguard; Michelle Davis, lifeguard; Joshua Cruz, friend and witness; Felicia Mar-low, friend and witness; and Maria Bella, aquatics expert. Defendant offered the testimony of three individuals including Maureen Taylor, business manager for student government at SUNY Potsdam; William Fisher, assistant vice-president for facilities at SUNY Potsdam; and Calvin Smith, director of environmental health and safety at SUNY Potsdam. Numerous documentary and photographic exhibits were offered by the parties and received into evidence. The parties also submitted post-trial memoranda.
Facts
Claimant arrived at the Maxcy Pool, located on the campus of SUNY Potsdam, at approximately 8:00 p.m. on January 27, 2009 for the purpose of engaging in recreational swim. This was the first occasion that claimant had engaged in recreational swim at SUNY Potsdam after learning about the recreational swim program through flyers that the college had posted around campus. She arrived at the pool that evening with two friends— Joshua Cruz and Felicia Marlow. Claimant and Marlow went into the women’s locker room to change into their swimsuits *881 before entering the pool area, and Cruz went into the men’s locker room. Claimant, Marlow and Cruz subsequently entered the pool area by exiting their respective locker rooms. Claimant was attired in her high school team swimsuit. Claimant acknowledges walking past and glancing at a sign as she exited the locker room that listed rules for the pool. She did not read the entire sign, but only that portion of the sign which states “Respect Lifeguard Staff Directives At All Times” (claimants’ exhibit 52) .[2]
The pool was divided by a movable bulkhead into two sections: a diving well and a six-lane lap swim area.[3] The diving well was located at the deep end of the pool, and the lap swim area was located between the bulkhead and the shallow end of the pool. There were also six starting blocks permanently affixed to the deck at the pool’s most shallow end, which measured four feet in depth. The pool became gradually deeper from the four foot depth in the shallow end to 10 feet in depth at the bulkhead. The diving well reached a depth of 13 feet. The starting blocks were not covered or blocked off, nor were there any cones atop the blocks.
After exiting the locker rooms, the three friends proceeded to lane Ño. 6 at the shallow end of the pool. Cruz entered the water, while claimant and Marlow walked to the lifeguard stand so that claimant could ask the lifeguards whether she could use the starting blocks to do her laps in the pool. There were two lifeguards on duty that night — Meghan McCrimmon, senior lifeguard, and Michelle Davis. Claimant made the request to use the starting blocks and informed lifeguard McCrimmon that she swam in high school. McCrimmon denied claimant’s request to use the starting blocks because there were children in the pool, and McCrimmon did not want the children to think it was okay for them to use the blocks.
Claimant and Marlow returned to the shallow end of the pool, sat on the edge of the pool and slid into the water. Claimant proceeded to swim 16 laps when Marlow noticed that all of the children had left the pool area. Claimant swam to the lifeguard *882 station and made a second request to use the starting blocks. Lifeguard McCrimmon responded to claimant’s request by stating “sure, go for it” (tr at 155, 390).[4]
Claimant returned to lane No. 6 and climbed onto the starting block (claimants’ exhibits 46, 47 50). She got into a “track start” (tr at 393), and dove off the block using a streamline entry into the water. After entering the water, claimant recalls that the “bottom of the pool seemed to rush up way too quickly . . . like a bright flash of light and radiating from [her] core, [a] feeling of like tingling, numbness spread through [her] body” (tr at 395). She next recalls floating to the surface of the water, face down. McCrimmon then jumped down from the lifeguard chair and with the help of Davis and Cruz, pulled claimant out of the pool. No backboard was used in removing claimant from the water and neither lifeguard entered the pool. McCrimmon telephoned university police from a phone in the pool area adjacent to the pool office. University police officers arrived, followed thereafter by campus rescue and professional rescue.
Discussion
It is well settled that in order to establish a prima facie case of negligence, “ ‘a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff ” (Comack v VBK Realty Assoc., Ltd., 48 AD3d 611, 612 [2008]; see also Akins v Glens Falls City School Dist., 53 NY2d 325 [1981]; Pulka v Edelman, 40 NY2d 781 [1976]; Keating v Town of Burke, 86 AD3d 660 [2011]). The court notes further that claimant bears “the burden of proving [her] case by a fair preponderance of the credible evidence” (Rinaldi & Sons v Wells Fargo Alarm Serv., 39 NY2d 191, 196 [1976]).
Upon review of the relevant legal principles and their application to the facts presented, and after considering all the evidence, including the exhibits received into evidence and the testimony and demeanor of the witnesses, the court finds that claimant presented sufficient prima facie proof to establish her cause of action for negligence.
It is undisputed that on January 27, 2009, while participating in a recreational swim program located at the Maxcy Pool on the campus of SUNY Potsdam, claimant dove off the starting blocks, which were located at the shallow end of the pool, and *883 struck the bottom of the pool (tr at 297-300, 339-340, 392-396). It is also undisputed that on two occasions that evening claimant asked the lifeguards on duty if she could use the starting blocks, and that on the second occasion, the senior lifeguard on duty granted her permission to use the blocks (tr at 153-156, 237-242, 383-390).[5]
Claimant presented uncontroverted testimony from the director of intramurals and recreation at SUNY Potsdam, Beauchamp, and the two lifeguards that were on duty at the time of her accident, that the lifeguards were permitted to use (and did use) their discretion in permitting recreational swimmers to use the starting blocks (tr at 61-62, 120-122, 228-230). Permission was granted in direct derogation of the pool’s policies, as provided for on a sign that was posted in the pool area, which states, in relevant part, that there is to be “no diving from competition starting blocks” (defendant’s exhibit Q). The lifeguards’ use of discretion in permitting recreational swimmers to use the diving blocks was also in derogation of the pool’s policy that diving from the starting blocks was not permitted except during competitive swim meets or supervised swim practices (tr at 54-55), as well as the State Sanitary Code which provides that the “[u]se of starting blocks is prohibited except during competitive swimming or swimmer-training activities” (10 NYCRR 6-1.24 [e]; tr at 55-56, 491). Calvin Smith, the director of environmental health and safety at SUNY Potsdam, also testified that the lifeguards should not have been instructed to use their discretion to allow use of the starting blocks during recreational swim because permitting such use violated the school’s pool policy and the State Sanitary Code (tr at 588, 596-597).
The court credits the compelling testimony from claimant’s aquatics expert, Maria Bella (tr at 442-450). Based upon her *884 own lifeguard training and significant experience as a lifeguard instructor for aquatic facilities (compare Ray v State of New York, 305 AD2d 791, 792 [2003] [engineer in wrongful death drowning claim lacked “the specialized knowledge, skill, training or education necessary to qualify him as a water safety expert”]), Bella testified in a persuasive manner that the actions of the lifeguards in allowing claimant to dive off the starting blocks were not consistent with the standards of good and proper lifeguarding (tr at 445-447, 492-493). Noting that “there are rules and policies and procedures that must be followed and [that] the lifeguards are responsible for enforcing those” (tr at 493), and referring to an excerpt from the American Red Cross Lifeguard Manual (claimants’ exhibit 57), which is utilized to train and certify lifeguards (tr at 480-481), Bella testified that starting blocks “are to be used only under proper supervision and during competitive training activities or competition activities” (tr at 493; see also claimants’ exhibit 13 at 9; claimants’ exhibit 56; tr at 103). Thus, the answer to claimant’s second request to use the starting blocks during a recreational swim should have been an “emphatic[ ] no,” and permitting lifeguards to exercise discretion in allowing swimmers during a recreational swim program to use starting blocks was not “in accordance with standards of good and proper lifeguard management and control” (tr at 493-494). In other words, the lifeguard is charged with enforcing all pool rules and policies, not deciding which rules, in the lifeguard’s discretion, should be enforced (tr at 493; see also claimants’ exhibit 7, Swimming Pool Safety Policy, effective Jan. 23, 2008, at 6 [“The lifeguard on duty is to assure compliance with rules and regulations”]).
Bella further opined in an effective manner that the training, supervision and oversight of the lifeguards by SUNY Potsdam was “inadequate” (tr at 494). She testified, among other things, that relying only on the certifications presented by the lifeguards was not sufficient (tr at 495), and that Beauchamp did not
“confirm[ ] [the lifeguards’] certification^], mak[e] sure that they had the knowledge and ability to do what they were being hired to do, specify[ ] exactly what they were suppose to do at the facility, how they were suppose to do it, provid[e] in-service training and ongoing training to the lifeguards to make sure that they could and would carry out their duties and responsibilities in the proper manner *885 and then oversee [ ] them to make sure that they were acting in accordance” (tr at 495; see also tr at 496).
Indeed, the record is replete with proof that the training and supervision of the lifeguards was deficient. Beauchamp testified that he did not review the contents of the pool’s safety policy manual (claimants’ exhibit 7) with the lifeguards, nor did he determine whether the lifeguards were familiar with the contents of the manual (tr at 52). Notably, Beauchamp could not remember if he had informed lifeguards McCrimmon and Davis to read the safety policy (tr at 50-52) and was unable to “say for sure if [he] went over the use of starting blocks” with the lifeguards on duty when claimant’s accident occurred (tr at 58). Beauchamp stated that the orientation for lifeguards after being hired consisted of “a walk through in the pool with them and that would be it” (tr at 38). The lifeguards recalled being told about the location of the locker rooms, the pool lights and the rescue equipment, such as backboards, but did not recall any discussion of pool rules or regulations (tr at 109, 118, 226) or use of the starting blocks and diving (tr at 118-119, 227).[6] There was also no proof that the lifeguards received any in-service training or testing after being hired (tr at 43, 52-53, 496).
Additionally, the court credits the expert testimony that defendant should have placed barriers, cones or covers on the starting blocks to restrict their use and to demonstrate to patrons that the blocks were not for general use, or not for use other than during competitive swim practice or during a swim meet (tr at 460, 481, 488-489; claimants’ exhibits 57, 58). Mc-Crimmon and claimant testified that no such restrictions were on the starting blocks when the accident occurred during recreational swim (tr at 118, 130, 149-150, 376).
The court is unable to conclude, however, based upon the proof presented, that defendant’s continued placement of the starting blocks at the shallow end of Maxcy Pool constitutes negligence. Although claimants offered several studies and *886 manuals that discuss the dangers of permitting the use of starting blocks in shallow water (see claimants’ exhibits 60, 63, 64), they did not offer any proof to establish that defendant was required to either remove the existing blocks or relocate the blocks to the deep end of the pool.
To the contrary, defendant offered proof, through the testimony of William Fisher, assistant vice-president for facilities at SUNY Potsdam, to establish that current building codes were followed at the time of the pool’s construction between 1971 and 1972; that the original starting blocks were “changed out to the current blocks in 1988”; and that there was never any change in the applicable “regulations, codes or other types of dictates [that] would have required” removal and relocation of the starting blocks (tr at 543-545). Fisher acknowledged an amendment to the State Sanitary Code in 1992 to require “a certain minimum water depth” for the installation of starting blocks, but testified that the 1992 amendment did not require defendant to remove or relocate the starting blocks at Maxcy Pool because the pool “was in compliance with the code at the time it was built” (tr at 572-573). Moreover, SUNY Potsdam’s director of environmental health and safety, Calvin Smith, testified that there were never any directions from the New York State Department of Health (hereinafter DOH), following any of its inspections of Maxcy Pool prior to 2009, “relative to the starting blocks” (tr at 582). DOH did not indicate that defendant was in violation of the Sanitary Code or that it was required to remove the starting blocks from the shallow end of the pool (tr at 584). Thus, although it seems apparent to the court that the prudent choice would have been to either remove or relocate the starting blocks, there is no proof before the court to establish that defendant was required to do so.
The court must now direct its attention to defendant’s affirmative defense of assumption of risk. “Assumption of risk encompasses two distinct doctrines” (Phelan v State of New York, 11 Misc 3d 151, 166 [2005]). “The first is akin to comparative negligence and does not bar recovery, but reduces recovery in the proportion to which a claimant’s culpable conduct contributed to his or her injuries” (id., citing CPLR 1411). The second, which is “referred to as primary assumption of risk ... is not a measure of comparative fault, but a measure of the defendant’s duty of care” (id.). “Under the doctrine of primary assumption of risk, a person who voluntarily participates in a sporting activity generally consents, by his or her participation, to those *887 injury-causing events, conditions, and risks which are inherent in the activity” (Cotty v Town of Southampton, 64 AD3d 251, 253 [2009]). “[W]hen a plaintiff assumes the risk of participating in a sporting event, ‘the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence,’ ” (id. at 254, quoting Turcotte v Fell, 68 NY2d 432, 438 [1986]), unless “the defendant’s conduct. . . unreasonably increasefs] the risks assumed by the plaintiff” (id. [emphasis added]; see also Morgan v State of New York, 90 NY2d 471, 485 [1997] [“participants will not be deemed to have assumed . . . unreasonably increased risks”]).
“[I]n assessing whether a defendant has violated a duty of care within the genre of tort-sports activities and their inherent risks, the applicable standard should include whether the conditions caused by the defendants’ negligence are ‘unique and created a dangerous condition over and above the usual dangers that are inherent in the sport’ ” (Morgan v State of New York at 485, quoting Owen v R.J.S. Safety Equip., 79 NY2d 967, 970 [1992]; Cole v New York Racing Assn., 24 AD2d 993 [1965], affd no op 17 NY2d 761 [1966]).
“Put differently, the question is whether defendant’s conduct placed plaintiff in a more vulnerable position than plaintiff would have been in had defendant done nothing” (Heard v City of New York, 82 NY2d 66, 72 [1993], rearg denied 82 NY2d 889 [1993]). “A showing [of] some negligent act or inaction, referenced to the applicable duty of care owed to him by [the] defendants, which may be said to constitute a substantial cause of the events which produced the injury is necessary” (Morgan v State of New York at 485, quoting Benitez v New York City Bd. of Educ., 73 NY2d 650, 659 [1989] [internal quotation marks omitted]). Moreover, “application [of the doctrine of assumption of risk] must be closely circumscribed if it is not seriously to undermine and displace the principles of comparative causation that the Legislature has deemed applicable to ‘any action to recover damages for personal injury, injury to property, or wrongful death’ ” (Trupia v Lake George Cent. School Dist., 14 NY3d 392, 395-396 [2010] [citation omitted], quoting CPLR 1411).
Here, the court finds that defendant’s conduct in advising its lifeguards to exercise discretion in permitting recreational swimmers to use the starting blocks and, in turn, the lifeguards’ affirmative conduct in granting claimant permission to use the blocks, “unreasonably increase[d] the risks assumed by the *888 [claimant]” (Cotty v Town of Southampton at 254) in diving off the starting blocks. Thus, recovery is not barred as the doctrine of primary assumption of risk is not applicable to the unique circumstances presented by this claim.
The court is cognizant of several decisions denying relief to plaintiffs that sustained injuries as a result of diving into pools based upon the injured party’s assumption of the risk of such an activity (see Howard v Poseidon Pools, 72 NY2d 972 [1988]; Jahier v Jahier, 50 AD3d 966 [2008]; Cook v Town of Oyster Bay, 267 AD2d 192 [1999]; Clark v Sachem School Dist. at Holbrook, 227 AD2d 366 [1996]; Valdez v City of New York, 148 AD2d 697 [1989]; Mullen-Hall v Buranich, 2003 NY Slip Op 40003[U] [2003]). In those cases, however, the plaintiff was familiar with the pool and had dove in it numerous times before sustaining an injury. The court is also mindful of diving cases where relief was denied to plaintiffs who alleged that the lifeguards on duty allowed a swimmer to dive from a jetty (see Heard v City of New York, supra), or failed to enforce a “no diving” rule at a pool (see Colon v City of New York, 200 AD2d 704 [1994]), or were not trained to prevent shallow water dives at a lake (see Mosher v State of New York, 145 AD2d 682 [1988], lv denied 73 NY2d 708 [1989]). In these decisions, however, the injured party had ignored lifeguard instructions and/or engaged in irresponsible, dangerous or prohibited conduct at the time the accident occurred.
Here, unlike the circumstances presented in the aforementioned cases, defendant affirmatively acted in a manner which was a substantial factor in causing claimant’s accident. It is undisputed that the senior lifeguard on duty denied claimant’s first request to use the starting blocks, and that claimant abided by the lifeguard’s directive. Further, as there was no proof that claimant was misbehaving or disregarding lifeguard staff directives, it therefore stands to reason that claimant would have abided by the lifeguard’s second denial, had the lifeguard opted to deny claimant’s second request, and that, but for the lifeguard granting claimant’s second request to dive off the blocks, in derogation of the pool’s policies and the State Sanitary Code, claimant would not have sustained injury.
An analysis of comparative negligence is required to determine the extent, if any, that claimant is responsible for her injuries. Specifically, the “awareness of risk is not to be determined in a vacuum. It is, rather, to be assessed against the background of the skill and experience of the particular plaintiff” (Maddox v *889 City of New York, 66 NY2d 270, 278 [1985]; see also Morgan v State of New York at 486; Benitez v New York City Bd. of Educ., 73 NY2d 650, 657 [1989]; Phelan v State of New York at 161). Thus, in order to make such an analysis, the court must consider claimant Kresandra Buckley’s background, skill and experience.
In this regard, claimant’s own testimony establishes that, at the time of her accident, she possessed a moderate degree of skill and experience as a result of her participation on her high school swim team, and limited knowledge of Maxcy Pool. Claimant testified that she was on her high school swim team during the ninth, eleventh and twelfth grades (tr at 364, 402-403), but that she participated as the team manager during eleventh grade due to an injury (tr at 402-403). She stated that she neither had any lifeguard training nor worked at a pool or aquatic facility (tr at 371). During her time on the swim team, she received instruction in the use of starting blocks, which were located at the deep end of the pool, and was trained to perform a track start off the blocks with a streamline entry (tr at 366-367). During practices, claimant would usually start her laps by diving off a starting block (tr at 402). She participated in several swim meets at various schools where the starting blocks were similarly located at the deep end of the pool (tr at 368-370, 407-408). Claimant was present at Maxcy Pool on two occasions for high school sectionals (tr at 370). Although she did not participate in any of the sectionals meets at Maxcy Pool, and never had occasion to dive off the starting blocks at Maxcy Pool, she was permitted to swim in the pool before the sectionals meet started (tr at 370, 404).
During her second semester at SUNY Potsdam, claimant participated in three physical education classes at Maxcy Pool prior to her January 27, 2009 accident (tr at 374). She did not get in the pool in the first class, swam one lap for time during the second class, and swam laps during the third class after the class had met in the shallow end (tr at 375, 410-411). At no time during any of the three physical education classes did anyone dive off the starting blocks, nor were students given any instruction, training or warnings regarding use of the starting blocks (tr at 376). She had not participated in recreational swim at Maxcy Pool prior to the evening of her accident (tr at 372).
Conclusion
Thus, upon weighing the evidence and considering the proof, the court concludes that claimants have established by a *890 preponderance of the credible evidence the cause of action sounding in negligence against defendant. The court further concludes that based upon claimant’s foregoing testimony, as well as the entirety of proof offered at trial, claimant is 60% liable and defendant is 40% liable for the injuries sustained by claimant on January 27, 2009. Any motions made at trial upon which the court had previously reserved or which remain undecided are denied.[7]

. The sign listing the Maxcy Hall pool policies also states, among other things, “No Diving From Competition Starting Blocks” and “If You Are Uncertain About Any Activities Related To The Pool Area Please Ask The Person On Staff” (claimants’ exhibit 52, also received into evidence at trial as claimants’ exhibit 51 and defendant’s exhibit Q).

. Several photographic enlargements of Maxcy Pool, showing, among other things, the pool, the bulkhead, the starting blocks and the pool deck, were received into evidence (see claimants’ exhibits 44-50).

. All references to the trial transcript are delineated herein as (tr at —).

. Sufficient proof was offered to establish that defendant maintained control and direction of the lifeguards, and that the lifeguards were therefore special employees of defendant (see Thompson v Grumman Aerospace Corp., 78 NY2d 553 [1991]; Ribeiro v Dynamic Painting Corp., 23 AD3d 795 [2005], lv denied 6 NY3d 707 [2006]; Williams v General Elec. Co., 8 AD3d 866, 868 [2004]). The director of intramurals and recreation at SUNY Potsdam, Beauchamp, an employee of SUNY Potsdam, testified that he was responsible for interviewing, hiring and supervising the lifeguards (tr at 22, 31-34), and that the Student Government Association (hereinafter SGA), the agency responsible for issuing paychecks to the lifeguards (tr at 37), played no part in the supervision or monitoring of lifeguards, or in the operation of the recreational swim program (tr at 34-37). The SGA’s business manager, Taylor, confirmed that the SGA does not train, supervise or monitor the lifeguards, nor does it operate Maxcy Pool (tr at 531).

. McCrimmon only recalls being told not to allow swimmers to do flips off the high dive (tr at 124) and in her voluntary statement given on January 28, 2009, she stated that “[a]t this time, there was no hard and fast rule about people using the blocks. It was discouraged but not strictly enforced” (claimants’ exhibit 3). Davis, in her voluntary statement, stated that “[generally, we don’t allow people to use the blocks, but under certain circumstances we can let people use them. If they are on the swim team or if they specifically ask and have experience we can make exceptions” (claimants’ exhibit 4).

. The court notes the pendency of motion No. M-79620 and motion No. M-79852 concerning third party motion practice commenced after trial between third-party claimant State of New York and third-party defendant Tower Insurance Company of New York.